FRANCIS R. CRONIN vs. UNIVERSAL CARLOADING AND
DISTRIBUTING CO., INC. & another.

Middlesex.    January 6, 1965. — March 3, 1965.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER,
& SPIEGEL, JJ.

*Landlord and Tenant*, Tenant's liability to third person, Landlord's liability to third person, Railroad freight house. *Negligence*, One owning or controlling real estate, Invited person, Railroad freight house.

The record in an action did not warrant a finding that a tenant of a small storage space in a long railroad freight house adjacent to specified doors on the side of the freight house was in control of a wooden "ladder" nailed to the outside of the building near another door, and the tenant was not liable to a truck driver for injuries sustained by the breaking of a rung of the "ladder" as the truck driver was climbing it to gain access to the building in the course of delivering goods to the tenant. [648–649]

A railroad would be liable for injuries to its own invitees occurring in a part of its freight house of which it retained control and to which the invitation extended, if caused by the railroad's negligent acts or omissions, although such invitees came to the freight house to deliver goods to tenants of the railroad there. [649–650]

In an action against a railroad which invited truck drivers delivering goods at its freight house to use "a regular stairway" at one end of the building, although drivers frequently gained access to the building by a vertical ascent on wooden "ladders" nailed to the outside of the building, evidence did not warrant a finding either that the railroad had provided the "ladders" or that it had impliedly extended to drivers an invitation to use them, and the railroad was not liable to a driver who "chose to take this short-cut" by climbing one of the "ladders" and was injured when a rung broke. [650–651]

TORT. Writ in the Superior Court dated April 20, 1961. The action was tried before *Tomasello, J.*

*Edward R. Langenbach* for Universal Carloading and Distributing Co., Inc.

*Anthony Serra* (*James T. Flynn* with him) for the plaintiff.

*Charles F. Choate* for the New York Central Railroad Company.

CUTTER, J.   Cronin seeks to recover against Universal Carloading and Distributing Co., Inc. (Universal) and the New York Central Railroad Company (the railroad) in separate counts for personal injuries sustained while making a "delivery at the freight-loading platform . . . in the railroad yards."   The trial judge directed a verdict for the railroad.   He denied Universal's motion for a directed verdict.   The jury returned a verdict for Cronin against Universal.

The consolidated bill of exceptions presents (a) Universal's exceptions to the denial of a directed verdict for it and of various requested rulings, to rulings on evidence, and to portions of the charge, and (b) Cronin's exception to the directed verdict for the railroad.   The evidence is stated in its aspect most favorable to Cronin.

On the afternoon of April 27, 1959, Cronin went to the yards to make a delivery to Universal.   He backed his truck to door No. 34 and "started to climb the ladder to get up on the platform."   There "were two rungs on the 'ladder.'"   Cronin "put his foot on the first rung and was reaching for the second when he felt the rung give way."   He hit his knee and felt pain.   He then observed "that the lower rung was broken; that it was 'slit like that, and was sort of jagged and was hanging down.'"   Cronin's further description of the rung is set out verbatim in the margin.[1]   The freight from Cronin's truck was accepted at door

---

[1] Cronin testified that the "rungs were about 2½ feet long, 3½ or 4 inches wide and about an inch thick; that the break was probably about half-way, maybe 15 inches or so, about half-way in the center; that it was kind of a jagged split and 'where it had split, was dirty and sort of grayish, and then there was probably two or three inches was clean-like'; that the clean part was about in the center; that the rung when he observed it was hanging down from the right; the right side was down and the left side was still up . . . ." He also testified that "the floor of the building, at the doorway up to which he backed his truck, is about four feet above the ground and lower than the tailboard of his truck which is about four and a half feet high; that at the freight doorway there are heavy square wooden beams or posts about 8" x 8" or 6" x 6" running from the platform down toward the ground; that there is another doorway beside the doorway in question with the same kind of platform and heavy beams or 8" x 8" pieces of wood against the bricks; that between the two 8" x 8"'s or 6" x 6"'s there were a couple of pieces of wood nailed or fastened across (indicating); that the pieces of wood were probably 4" wide and about an inch thick; that 'that is what he calls a ladder'; that to get up onto the platform by stepping on those he'd have to take two steps and then swing onto the platform . . . ."

No. 34, and a man took Cronin's papers for him "to the office located at the further end of the platform." There were in evidence receipts running to Cronin's company for certain freight, marked "Received Universal Carloading & Dist. Co. Boston, Mass. Apr. 27, 1959, by Boston & Albany R.R. per JM."

The "freighthouse is just one big wide-open shed." The "custom was [for truckers] to take any door that was vacant," and to deliver freight for Universal at any door. No specific doors were marked for Universal. Near door No. 60 there was a doorway to the office and "there was a regular stairway and you go up these five . . . [or] six stairs to the level of the platform and then walk into the office and deliver your papers, but he chose to take this short-cut." The building is 500 to 600 feet long and "on the side of the freight shed there were about thirty doors numbered from 2 to about 60." There "is just one regular stairway outside of these 'ladder types' located" near door No. 60. The stairway was "right opposite the office . . . [Cronin] was going to."

Cronin and another driver, one Shea, testified in substance, subject to Universal's exception, that they had observed over a considerable period that "other truckers gained access to the platform" by climbing "up these ladders if they were too far away from the stairway or if it had been snowing or raining." Shea testified that the practice was to "back into an open door . . . go to the head of the house, have your papers blocked, come back and put your freight on . . . trucks or in separate lots," and have the clerk check it and sign "your papers." Shea said, "generally there is a little ladder step by the doors, the average door, and you climb up on your tailboard and into the house." The steps, usually two, are nailed "on the side of the doors — the base of the door down near the ground" apparently to posts. The steps are "pieces of 1″ x 4″ or 2″ x 4″ nailed across between the posts, between the doors . . . not at all places but only at some places." They are "wooden braces which the men use as steps to

climb up." There is "a doorway with a regular stairway leading to it from the outside at the end of the building where the Universal office is." No photographs appear in the record.

By a duly accepted letter of January 24, 1956, the railroad allowed Universal for a rental of $50 a month "the use of about 1850 square feet of space adjacent to [d]oors 24 to 30 . . . for the storage, sorting and loading of New York shipments." The permission was granted "upon the express condition that you [Universal] will assume all responsibility and liability for loss, damage or injury to persons or property while on the premises of the [r]ailroad . . . in using or exercising the . . . permission . . . and that you agree to indemnify . . . the [r]ailroad . . . from any and all damages . . . growing out ·of any such loss, damage or injury . . . ."

1. Universal requested the judge to rule that Cronin was "not entitled to recover against . . . Universal . . . because . . . [it] was not in control of the place where the accident occurred . . . [and] was not negligent." Liability for injury in a case like this, if the injury is shown to be caused by failure to use due care to maintain premises properly, depends upon control of the offending instrumentality. See *Underhill* v. *Shactman,* 337 Mass. 730, 733.

The evidence indicated that Universal had permission to use 1,850 square feet of storage space adjacent to doors Nos. 24 to 30. This accident took place near door No. 34. There was no evidence which would warrant the jury in finding that Universal had, or actually exercised (*Boronskis* v. *Texas Co.* 344 Mass. 477, 480), control of the exterior of the building below the platform at door No. 34 or of any adjacent land, although Universal and its customers were permitted to use this area.[2] By the exchange of letters

---

[2] No evidence suggested that Universal had either permanent or temporary control of the exterior area around each door of the building at which one of its customers might choose to place his delivery vehicle. Indeed, no evidence suggests that Universal controlled any exterior space, even at doors Nos. 24 to 30. The circumstances, that the freight house was one big open area and that freight was accepted at any door for Universal, do not warrant the inference that Universal had control of areas outside its 1,850 square feet.

Universal did not assume any obligation to maintain any space except, perhaps, the 1,850 square feet which it was to use. Cf. *Brazinskos* v. *A. S. Fawcett, Inc.* 318 Mass. 263, 265. Cf. also *Laskowski* v. *Manning,* 325 Mass. 393. Instead, the record indicates that the railroad controlled the yard and permitted occupation of portions of the freight buildings by various tenants apparently engaged in some type of freight operations, likely to contribute to the railroad's own freight business. The names of some of these tenants (e.g. Texas Freight, Westland Transportation, Western Carloading), as well as Shea's testimony, suggest that these tenants were, in part at least, freight gatherers or forwarders. See *Judson Freight Forwarding Co.* v. *Commonwealth,* 242 Mass. 47, 50–51. In such circumstances, the railroad's position seems to have been much like that of the owner of the shopping center considered in *Underhill* v. *Shactman,* 337 Mass. 730, 733–734, in that the railroad rented to tenants parts of its general storage space, and perhaps also offices, while permitting general use of some land, parking areas, and common stairs, passageways, and platforms. See *Murphy* v. *Alpine Press Inc.* 291 Mass. 239, 240–241. See also *Peay* v. *Reidy,* 321 Mass. 455, 458–460; *Summering* v. *Berger Realty, Inc.* 344 Mass. 38, 41; Restatement: Torts, § 360.

Since there is no affirmative evidence of any negligent act or omission (contributing to Cronin's injury) by or in behalf of Universal, or of any control by Universal of the accident area, the ruling (already quoted) requested by Universal, and also its motion for a directed verdict, should have been granted. It is not necessary to discuss Universal's other exceptions.

2. We think that the description of the railroad as lessee in the heading of the rental letter, as well as common knowledge in the community, established that the railroad was the operating lessee of the Boston & Albany's railroad properties. See St. 1900, c. 468; *Boston & Albany R.R.* v. *New York Cent. R.R.* 256 Mass. 600, 605. Despite somewhat meager evidence concerning the operation, mainte-

nance, and repair of the yard and the freight premises, the jury might reasonably have inferred that the railroad (for its own benefit as well as that of its tenants) extended an invitation to persons like Cronin delivering freight to the railroad's tenants to use those parts of the yard which appeared reasonably available for their use. See *Underhill* v. *Shactman,* 337 Mass. 730, 733–734. This is not a case where the rule of *Isenberg* v. *Lushan,* 343 Mass. 315, 316, and similar cases should be applied. The record does not suggest that the railroad had transferred to the control of others, for maintenance and repair, any areas, other than those rented to tenants for storage and similar activity. Accordingly, we think that the railroad would be liable for injuries to its invitees occurring in a place (perhaps excluding places rented to a tenant) to which the invitation extended, if caused by the railroad's negligent acts or omissions.

3. The "ladder" is not very adequately described in the record, which affords little assistance in determining to what extent its use by visitors was reasonably contemplated. The presence of proper stairs elsewhere indicates that they, rather than the "ladders," were intended as the means of access to the building. The testimony about the "ladders" does not suggest that they had been put up by the railroad rather than casually by users of the yard for their own convenience. It is unlikely (in view of the small dimensions of the boards used as rungs) that they were support timbers availed of for uses for which they were not intended. Cf. *Chelefou* v. *Springfield Inst. for Sav.* 297 Mass. 236, 240–241.

Cronin himself said that in using the "ladder," he "chose to take this short-cut." Cf. *Brosnan* v. *Koufman,* 294 Mass. 495, 497–502; *Roberts* v. *Reuban A. Grossmann, Inc.* 346 Mass. 769. This in itself tends to show that he knew he was making an uncontemplated use of the premises when (instead of using stairs which he was clearly invited to use) he gained access to a platform or door four feet high by a vertical ascent on timber rungs merely nailed into posts supporting the building.

The railroad did not owe Cronin, with respect to any part of the yard as to which the invitation did not reasonably extend, the duty of care which it would owe to an invitee. See *Morong* v. *Spofford,* 218 Mass. 50, 52; *Paris* v. *Howard D. Johnson Co.* 340 Mass. 739, 741–742; *Firfer* v. *United States,* 208 F. 2d 524, 528–529 (Ct. App. D. C.); Restatement 2d: Torts (Tent. draft No. 5, April 8, 1960), § 332, pp. 67–68, formerly Restatement: Torts, § 343, comment b; Prosser Torts (2d ed.) § 78, pp. 458–459; Harper & James, Torts, § 27.12. Nor did the invitation extend to any type of use other than that reasonable in the circumstances. See *Cohen* v. *Davies,* 305 Mass. 152, 154–155; *Greenfield* v. *Freedman,* 328 Mass. 272, 274–275. See also *Couto* v. *Trustees of N. Y. N. H. & H. R.R.* 312 Mass. 23, 26–27. Cf. *Benjamin* v. *O'Connell & Lee Mfg. Co.* 334 Mass. 646, 649–650; *Rosenston* v. *Bickford Shoes, Inc.* 340 Mass. 769, 771–772.

We recognize that the "ladders" were in a portion of the premises to which truck drivers were invited and that there was evidence of use of the ladders by drivers to gain access to the platform. We conclude, however, that not enough about these "ladders" has been shown to warrant the jury in finding either that the railroad provided them or that it impliedly extended to truckers using the yard an invitation to use them to reach the platform and doors.

4. This conclusion makes it unnecessary for us to determine whether on the confusing and indefinite testimony (fn. 1) about the board which broke it could be found (a) that there was indication prior to the accident of any defect (see *Gauld* v. *John Hancock Mut. Life Ins. Co.* 329 Mass. 724, 727; cf. *Fahey* v. *Osol,* 338 Mass. 429, 431–432), or (b) that any defect had existed for a long enough time so that the railroad should have known of it and removed the timber. See *Fine* v. *F. W. Woolworth Co.* 343 Mass. 328, 329. See also *Paquette* v. *Bradley, ante,* 326, 327–328.

5. Universal's exceptions are sustained. Cronin's exceptions are overruled.

*So ordered.*